[No. 29718.   Department One.   November 23, 1945.]

MYRON FOSTER, *Respondent*, v. MONTGOMERY WARD & COMPANY, *Appellant*.[1]

*Hayden, Merritt, Summers & Stafford* and *Stanley A. Taylor,* for appellant.

*Kerr, McCord & Carey* and *Stephen V. Carey,* for respondent.

SIMPSON, J.—Plaintiff instituted this action to recover an alleged balance due him on a contract for the sale of apples. The complaint upon which the action was tried contained the following allegations:

Plaintiff was engaged at Wenatchee, Washington, in the business of producing, packing, and selling fresh deciduous fruits. By written contract, dated October 6, 1942, defendant ordered from plaintiff 2,500 boxes of apples to be shipped directly to defendant's customers as ordered by defendant, price to be $2.25 per box, less a discount of fifteen per cent for all of the boxes shipped not later than March 30, 1943, and $1.75 per box for those not ordered shipped as of that date, less a fifteen per cent discount. The order was accepted by plaintiff, who, in compliance therewith, shipped 604 boxes prior to March 30, 1943. The defendant failed to order out the balance of the 2,500 boxes in accordance with the agreement and therefore became indebted to plaintiff in the sum of $2,825.04. Plaintiff was at all times ready, willing, and able to perform his part of the contract.

The answer denied the allegations of the complaint, except that defendant had shipped to plaintiff's customers 604 boxes of apples and had been paid therefor. In an affirmative answer, defendant alleged that there was a market for the apples which had not been delivered to defendant's customers, and that plaintiff had either disposed of or had the opportunity of disposing of them at a price equal to or in excess of that quoted in the complaint. The reply put in issue the allegations of the affirmative answer.

The cause was tried to the court, sitting without a jury. After the hearing was had, the court made findings of fact and conclusions of law and, based thereon, entered judgment for plaintiff in the amount of $2,825. A motion for a new trial was denied and this appeal followed.

The assignments of error are: (1) in permitting respondent to testify that he could purchase apples on the market to fill the balance orders; (2) in making a portion of finding No. 35; (3) in denying appellant's motion for dismissal made at the close of respondent's case and at the close of all the evidence; (4) in signing the findings of fact and judgment; and (5) in construing the contract to be one providing for liquidated damages.

In deciding this case, it will be necessary to set out facts relative to the gift-box business and the contract upon which this action was predicated. Respondent owns orchards near Lake Chelan, Washington, where he raises four varieties of apples and two varieties of pears, cherries, and peaches. In addition to other activities, respondent has, since 1939, conducted a gift-package business under the name of Hesperian Orchards. The gift-package business is strictly a mail-order business, secured through advertising in national publications and by circulars mailed to customers. The apples raised on respondent's orchard are of three grades, extra-fancy, fancy, and choice, the highest quality being extra-fancy. The apples used in the gift packages are a larger size of extra-fancy and are the superfine quality, taking into consideration color, shape, maturity, crispness, and "eatability." As the orders come in, the apples are sorted out and packed in small one-layer containers with a cell for each apple and with pad and paper wrappers surrounding the apples to avoid bruising and puncturing. The container, called a telescope box, is of fiberboard construction, has a glazed covering on the inside, and contains a pad and cellophane oiled paper to further pad the fruit and protect it in shipment. Each box contains twelve apples.

The fact that the various apples reach the highest stage of perfection at different seasons or months is a determining factor as to when they should be shipped. In anticipation of the 1942 season's gift-package business, based upon the experience of the previous year, respondent placed in cold storage, as a stock from which to fill the gift-package business, approximately 12,800 boxes. From the beginning of

the season in the fall of 1942 until the end of the season in 1943, respondent had on hand sufficient apples to fill all his orders, including the 2,500 boxes ordered by appellant.

There is little comparison between the gift-package business and the conduct of the ordinary commercial sale of apples in standard boxes. The gift-box apples are very large and their life short. The large apples have excess water. Their cells are weaker and they break down easier than the ordinary apple. If a large apple has a puncture in it, it immediately starts to decay. On the other hand, the little apple is woody and hard and keeps a long time. Apple buyers will not take big apples late in the season. The large apples retained for appellant became a total loss, and after March 30, 1943, they were dumped in a canyon near Wenatchee.

The contract which formed the basis of this action was in the form of a written order, dated October 5, 1942, given by appellant to respondent. June 3, 1942, W. W. Grimmer, of appellant company, wrote to respondent that appellant was considering the offer of fresh fruit to his customers. July 16, 1942, respondent explained to appellant how his gift-package business was conducted and emphasized that he would not, under any circumstances, consider shipping a stock of apples to any central point to fill orders as they might be received from customers. July 24, 1942, another letter was written to respondent to the effect that appellant company intended to use a considerable space in its Christmas gift catalogue for listing fruit in gift packages. August 10, 1942, respondent wrote appellant that he would require a definite commitment of 10,000 gift packages.

Several letters were then exchanged between the parties relative to the limitation on the number of packages that appellant should take. September 21, 1942, respondent wrote appellant as follows:

"This will acknowledge receipt of your wire and airmail letter of the 16th.

"Inasmuch as we have been making tentative plans on a 10 M box basis, it would be my suggestion that you guarantee us 5000 filled orders (instead of 2500 as suggested in your letter) and also guarantee the payment to us on what-

ever material we have on hand in excess of the 5000 up to 10,000 packages.

"Naturally, on the unfilled orders, the express item would enter into the price, i. e. the average express is fifty cents and this amount would be deducted from the $2.25—leaving $1.75—less 15%. On the filled orders the price would be $2.25 less the 15%."

Thereafter, on October 6, 1942, appellant wired respondent as follows:

"Let's make up 2500 boxes. If we sell more than 2500 will refund. If you cannot get more. Otherwise terms your letter September 21st satisfactory. Mailing order also proof of page."

This was followed by a letter on the succeeding day, the pertinent portion of which reads:

"Mr. Myron Foster                    October 7, 1942
Hesperian Orchards
Wenatchee, Washington

"Dear Mr. Foster:

"We wired you yesterday regarding our requirements on Hesperian apples as follows:

"LETS MAKE UP 2500 BOXES. IF WE SELL MORE THAN 2500 WILL REFUND IF YOU CANNOT GET MORE. OTHERWISE TERMS YOUR LETTER SEPTEMBER 21ST SATISFACTORY. MAILING ORDER ALSO PROOF OF PAGE.

"Attached is our order 40056 for 2500 boxes. Our intention is that you proceed to procure this quantity of boxes, pack the goods and be ready to make shipments when the orders come in following the mailing of this special catalog on October 28th. By November 10th we will have received enough orders to calculate whether 2500 is enough or about how many more packages will be needed. If at that time, it is within your power to supply more goods, we shall be happy. If not, when the 2500 have been shipped, we will refund for the balance of the season. . . . .

"It is unfortunate that we cannot talk with you to give you a clearer incite [insight] as to what we are trying to do, but we do wish that you would treat this experiment of ours as a special adventure and do all you can to bring it to a successful conclusion.

"I should like to have you tell us that you have provided the 2500 boxes to start with and that you will be ready to

make shipments the first of November. We shall notify you exactly the date the books are mailed and we shall discuss with you promptly after that date if any further boxes are needed."

The above letter was accompanied by a written order, dated October 5, 1942, which directed the respondent to ship

". . . 2500 boxes apples, gift packed, 2.25, 15% trade discount. To be made up packed for shipment direct to Ward's customers. Any quantity not ordered shipped as of March 30, 1943, may be invoiced at net cost less express charges—that is, $1.75 less 15%."

Under the arrangement, orders came in to respondent from appellant and were filled by the shipment of the apples direct to appellant's customers. Six hundred four boxes were ordered by appellant and shipped by respondent.

Appellant presses upon us error of the trial court in admitting evidence to the effect that apples were available in the Wenatchee market which could have been used in filling orders for appellant if respondent's own stock was depleted. This contention is entirely without merit, for the reason that appellant was not compelled to take other apples than those grown by respondent. Appellant was not in a position to make this complaint because it had not ordered any apples other than the 604 boxes, and those orders were filled by supply apples from respondent's orchards.

The only finding made by the court to which appellant objected is No. 35, which reads:

". . . at all times subsequent to the receipt of said order and up to and including March 30, 1943, the plaintiff had in storage or otherwise available a sufficient quantity of apples to fill all orders that might have been placed by the defendant from time to time and the plaintiff was at all such times ready, able and willing to perform said contract on his part by shipping the total of 2500 boxes as and when ordered by defendant."

As counsel for appellant points out, this was an essential finding, for the respondent, in order to recover on any theory, must demonstrate an ability and readiness to perform on his part. *Power v. Chadwick,* 166 Wash. 398, 7 P. (2d) 24.

■ Appellant contends that this finding was not supported by the evidence and that the evidence preponderates to the contrary. It predicates its contention relative to the evidence upon the answer to a certain interrogatory propounded to respondent. Counsel argues that the answer to the interrogatory made it definite and clear that respondent had not held the apples throughout the period of the contract to meet further orders from appellant's customers. The interrogatory was as follows:

"Please state the highest price for said apples, of said boxes or containers and of said boxes and apples together as a unit during each of the following months in 1943: April, May, June, July, August and September."

The answer was, in part:

"The 1942 crop of apples of the quality and varieties required to fill defendant's orders had all practically been sold prior to April 1, 1943. . . .

"When the defendant placed with the plaintiff the order described in the complaint herein, it became necessary that the plaintiff should arrange to always have a sufficient quantity of apples and containers available to promptly fill defendant's shipping orders received from day to day prior to March 31, 1943. No particular apples or containers were earmarked, or could be earmarked, in advance to fill defendant's orders. Throughout the season the plaintiff was required to keep in storage and always available, a large quantity of apples, graded according to the standard commercial grades, from which a sufficient number of perfect selected apples could be sorted out for use in filling defendant's orders as received up to the maximum quantity of TWENTY-FIVE HUNDRED (2500) boxes or packages. It is not possible to identify any particular apples or any particular container not ordered by the defendant as being shipped to plaintiff's other customers. The apples and containers that would have been used to fill defendant's orders, if such orders had been placed, were used in the regular conduct of plaintiff's business, and any apples left in storage after March 31, 1943, were no longer suitable for filling orders for gift boxes. As the season progressed it became necessary to reject from the total quantity of apples in storage greater and greater amounts in order to sort out apples of a superior quality suitable for filling gift package orders. Because it was known to be impossible to ascertain what the plaintiff's

loss might be upon defendant's failure to take deliveries to the maximum number of TWENTY-FIVE HUNDRED (2500) boxes of packages, the plaintiff insisted that the price for unshipped packages be fixed in advance and it was fixed as stated in the complaint at the price of ONE and 75/100 DOLLARS ($1.75) per box or package, less a discount of fifteen per cent (15%)."

The court allowed respondent to explain and to testify that up to March 30, 1943, he had on hand sufficient apples to fill the Montgomery Ward contract. In this he was corroborated by Kenneth Keiser, the warehouse foreman. Mr. Keiser testified that he obtained his information from a physical count of the apples taken every two weeks. He testified further that an endeavor had been made to sell a large amount of apples left after April 1, 1943, but that the buyers would not handle them.

Appellant claims that the answer to the interrogatory had the force of a judicial admission and was therefore binding upon respondent. In support of this position, it cites 31 C. J. S. 1086, § 309, and 31 C. J. S. 1067, § 299, which substantiate the position.

Upon the record in this case, we are not disposed to hold that the statement made by respondent in answer to interrogatory No. 2 precluded him from producing any evidence that he had apples on hand to fill the gift-package orders, had they been sent in during the latter part of March, 1943. Question No. 2 was indefinite and the answer, as expressed by respondent, showed that he could have filled the orders according to the provisions of the contract.

The admission of the evidence was within the discretion of the trial court. That discretion was not abused, hence this court will not interfere.

Appellant has not complained of error in the giving of the first portion of finding No. 35, which reads:

"The defendant, in placing said order for 2500 boxes of plaintiff's gift packages of apples, and the plaintiff, in accepting said order, intended that the bulk of the shipments would be made during the holiday season of 1942-43."

We hold that the evidence relative to having enough

apples on hand during the month of March, 1943, does not preponderate over the finding made by the trial court, but, on the other hand, supports that finding.

The next assignment of error calls in question the amount which should be allowed to respondent. It is appellant's contention that this action is for the purchase price of the apples and not for damages, that respondent has not established his right to collect the purchase price for the unshipped apples.

■ The rule of damages for the nonacceptance of property sold and contracted for is the amount of the actual injury to the seller in consequence of the nonacceptance, which ordinarily is the difference between the price agreed to be paid for it and its market value, where the price exceeds the value; but where the property in question is utterly worthless in the hands of the seller, the whole price agreed to should be recovered.

In *Parks v. Elmore,* 59 Wash. 584, 110 Pac. 381, where the buyer wrongfully refused to take fish according to the contract with the result that many of them spoiled, and the buyer had notice from the seller of his inability to sell the greater portion of them and knew of the danger of the spoiling, the measure of the seller's damage was held to be the contract price, less the net amount received from the fish actually sold.

In *State Finance Co. v. Hamacher,* 171 Wash. 15, 17 P. (2d) 610, this court determined that a seller could recover the full contract price for cedar poles: when it was shown that the buyer breached a contract of purchased standing timber to be cut into poles; when it was shown that the price of the poles had so declined that they could not be sold at any price; and that the timber was of no value to the seller.

The facts in *Stevenson v. Puget Sound Vegetable Growers' Ass'n,* 172 Wash. 196, 19 P. (2d) 925, showed that a buyer breached a contract to purchase peas by failing to supply the necessary containers required by the contract, and the grower was unable to resell the crop, due to the

fact that the contract expressly prohibited the sale of the peas to anyone other than the buyer, and, also, because of the fact that the peas not having been packed on time had become overripe and worthless.

It was held in *Bishop v. Descalzi*, 46 Cal. App. 228, 189 Pac. 122, that where a crop of oranges was destroyed by frost after the buyer refused to receive them, the seller was entitled to recover the contract price.

In *California Pear Growers' Ass'n v. Herspring*, 60 Cal. App. 503, 213 Pac. 518, the seller was held entitled to recover the full contract price because of the refusal of the buyer to accept perishable fruit where the fruit spoiled due to the buyer's default.

In *Grandt v. Kirkeby-Grunderstrup Seed Co.*, 185 Ill. App. 312, the buyer of onions refused to take them, and while awaiting his acceptance, the onions were frozen and rendered worthless. The buyer was held liable for the purchase price.

In *Dolby v. Laramore*, 121 Md. 618, 89 Atl. 442, a seller of perishable vegetables was allowed to recover the contract price, less the expense of packing and delivering, where it appeared that the buyer refused to receive a portion of the crop tendered him and refused to furnish the necessary baskets in which the balance of the crop might be packed for delivery, resulting in a large quantity of the crop rotting.

See, also, *Roswell Nursery Co. v. Mielenz*, 18 N. M. 417, 137 Pac. 579, and *Dobbins v. Edmonds*, 18 Mo. App. 307.

The same rule is applied in those cases where the buyer repudiates a contract for manufactured articles after the goods has been manufactured especially for the seller. Cases upholding this rule are cited in 44 A. L. R. 268.

Applying the rule to the facts in this case, we hold that the apples remaining in the hands of respondent after March 30, 1943, were worthless to him, that there was no market for them, and that he was entitled to collect the price named in the contract.

Appellant contends that the trial court erred in holding the contract to be one containing provisions for liquidated

damages. We deem it necessary to decide this question as another reason for our conclusion. In appellant's brief, it is stated: "Appellant's position is that the sum claimed by the respondent as stipulated damages is entirely unreasonable and unfair."

The general rules governing the question are well stated in 25 C. J. S. 654, Damages, § 101 c:

"The distinction between a penalty and a provision for liquidated damages is that a penalty is in effect a security for performance, while a provision for liquidated damages is for a sum to be paid in lieu of performance. As appears infra § 116 a, a provision in a contract as to the sum to be paid in the event of a breach will, if it is a provision for liquidated damages, be enforced according to its terms; but, generally, a contract cannot embrace a penalty so as to make performance more certain, and if a provision as to the amount payable on breach of the contract is for a penalty the recovery will be limited, as appears infra § 116 b, to the actual damages sustained. The importance of this distinction is thus obvious and the principal difficulties and conflicts in the cases occur in connection with the determination of the character of the particular agreement involved."

Section 116 b, mentioned above, relates to the amount of recovery in cases where the provision provides for the penalty. The rule as to what constitutes liquidated damages where a contract designates a sum to be paid for nonperformance, is laid down in *Madler v. Silverstone*, 55 Wash. 159, 104 Pac. 165, 34 L. R. A. (N.S) 1, in the following language:

"Generally speaking, it may be said, that when the damages arising from the breach of the contract which the obligation is given to secure, are uncertain in their nature and not readily susceptible of proof by the ordinary rules of evidence, and are not so disproportionate to the probable damages suffered as to appear unconscionable, and it is reasonably clear from the whole agreement that it is the intention of the parties to provide for liquidated damages and not a penalty, such a stipulation will be held to be one for liquidated damages."

In *Reichenbach v. Sage*, 13 Wash. 364, 43 Pac. 354, 52 Am. St. 51, the facts were that an individual contracted

to erect a building by a certain time and agreed to pay ten dollars per day for each day the completion of the building was delayed beyond the date named. This court held the provision to be one for liquidated damages and not as a penalty. In deciding the case, it was stated:

"There has been some conflict of authority on this question, each case, however, necessarily being decided with reference to its own particular circumstances and the particular language of the contract. We are satisfied, however, that the overwhelming weight of authority sustains the contention that this contract provides for liquidated damages; there is nothing inequitable in the terms of this provision; the amount does not seem to us to be excessive or unreasonable; it does not provide for the payment of a sum in gross on the failure to comply with the contract at the expiration of the time limited, but the damages accrue according to the length of time the breach continues; and again, there is an element of uncertainty as to the real damages which would be maintained by the plaintiff which renders it more or less impracticable to be determined by a jury."

In the following cases, this court has held that contracts providing for payments to be made because of failure to perform a contract to be for liquidated damages:  *Everett Land Co. v. Maney,* 16 Wash. 552, 48 Pac. 243, the giving of a note for four thousand dollars, which would be surrendered if the signer built a house upon a certain lot within eighteen months after the date of the contract to pay for certain lots; *Jennings v. McCormick,* 25 Wash. 427, 65 Pac. 764, owners of adjoining land agreed to build a dam to keep out tidewater and provided that two hundred dollars should be paid in the event another dam was not cut or damaged; *American Copper, Brass & Iron Works v. Galland-Burke Brewing & Malting Co.,* 30 Wash. 178, 70 Pac. 236, a written contract, which provided that twenty-five dollars per day should be paid as liquidated damages for each day the delivery of merchandise was delayed after the named date; *Drumheller v. American Surety Co.,* 30 Wash. 530, 71 Pac. 25, an agreement to pay a fixed sum of money for the failure to complete a building by a certain

day; *Canady v. Knox,* 43 Wash. 567, 86 Pac. 930, an agreement by the vendor of a business to forfeit two thousand dollars in case he engaged in that business within three years; *Jenkins v. American Surety Co.,* 45 Wash. 573, 88 Pac. 1112, the promise to pay as stipulated damages the sum of five dollars per day for delay in the completion of a building within the contract time; *Erickson v. Green,* 47 Wash. 613, 92 Pac. 449, an agreement to pay ten dollars per day in case certain work, consisting of removing earth, continued after the stipulated time for performance; *Madler v. Silverstone, supra,* a stipulation in the contract for the exchange of real estate and to pay five hundred dollars as liquidated damages for nonperformance of the agreement; *Williams v. Rosenbaum,* 57 Wash. 94, 106 Pac. 493, a provision in a building contract to pay ten dollars per day for delay in erecting a building; *Sheard v. United States F. & G. Co.,* 58 Wash. 29, 107 Pac. 1024, 109 Pac. 276, an agreement to pay ten dollars per day for each day a contractor defaulted in completing a contract to construct buildings; *Yatsuyanagi v. Shimamura,* 59 Wash. 24, 109 Pac. 282, four workman tailors imposed a forfeiture of one thousand dollars should anyone withdraw from the partnership; *Eilers Music House v. Oriental Co.,* 69 Wash. 618, 125 Pac. 1023, a stipulation in a conditional sales contract that the sums paid prior to breach should be considered as liquidated damages; *Grand Union Laundry Co. v. Carney,* 88 Wash. 327, 153 Pac. 5, the contract for laundry work at reduced rates, which guaranteed work to the amount of eighteen hundred dollars a year and provided that in case of failure so to do, the difference between the amounts actually furnished and eighteen hundred dollars should be the measures of liquidated damages; *Smith v. Lambert Transfer Co.,* 109 Wash. 529, 187 Pac. 362, a lease which provided for forfeiture of five thousand dollars as liquidated damages for the failure to perform; *Mosler v. Woodell,* 189 Wash. 583, 66 P. (2d) 353, a provision in a lease of a neon sign, giving the owner the right to repossess and to recover rents, or charges, falling due subsequent to forfeiture, less twenty per cent; *Benjamin Franklin Thrift Stores v. Jared,* 192

Wash. 252, 73 P. (2d) 525, an agreement for the forfeiture of a certain sum for failure to perform according to the terms of a written lease.

In the instant case, it is apparent from the facts that the actual damages suffered by respondent would be difficult and uncertain if resort to definite proof was compelled, and that the amount specified was not disproportionate to the actual loss. The following statement from the *Yatsuyanagi* case has a peculiar application to the factual situation:

"The nature of the business was such that, upon a breach of the contract, the ascertainment of damages would be difficult and uncertain, and it would require exceedingly nice discernment and clear distinction on the part of either court or jury to keep away from the realm of speculation and remoteness. . . . Neither is there anything to show that such sum is disproportionate to the actual loss, another feature much regarded by the courts in determining the question."

The trial court was correct in deciding that the provision for payment of $1.75, less fifteen per cent, as contained in the contract, was one for liquidated damages.

Finally, appellant contends that respondent cannot recover because he did not tender the apples to appellant prior to the beginning of this action. The rule upon which appellant depends is stated in *Wagner Co. v. Craib & Co.,* 114 Wash. 139, 194 Pac. 584, as follows:

"Where the obligations of the parties are mutual and concurrent, in order to fix the liability of the buyer, the seller must offer to perform upon his part by an actual tender of performance."

The statement of the rule is entirely correct, but has no application here. The contract provided for shipment to appellant's customers as indicated by orders received from appellant's office in Chicago. Respondent could not tender to unknown customers and it would have been entirely useless and disastrous to have shipped the perishable fruit to Chicago.

In any event, the failure to tender was occasioned by appellant. Its buyer, Cook, testified:

"That if the total number of boxes would not be shipped direct to our customers, then in that event I expected that those boxes would be shipped on my direction to somewhere else."

On cross-examination, Mr. Cook stated:

"Q. Again reading to you the language of the order which was read to you by counsel in the body of the order: 'To be made up packed for shipment direct to Ward's customers. Any quantity not ordered shipped as of March 30, 1943, may be invoiced at net cost less express charges—that is, $1.75 less 15%.' When you caused that language to be inserted in that order you intended it to mean just what it said, didn't you? A. Yes. Q. Yes. Now, you say that you intended that such boxes as you did not order shipped direct to your customers, these 1896 boxes, that it would be shipped somewhere else at your direction, is that what you said? A. That's right. Q. Did you ever give any direction to ship them anywhere else? A. No."

We are satisfied that the court correctly construed the contract and that its judgment should be affirmed. It is so ordered.

BEALS, C. J., MILLARD, STEINERT, and MALLERY, JJ., concur.